The Chicago and Eastern Illinois Railroad Company, Appellee, *vs.* Cornelius J. Doyle, Secretary of State, *et al.* Appellants.

*Opinion filed December 17, 1912.*

1. Corporations—*results which may follow the merger of corporations.* As a result of a merger of corporations the corporate existence of each of the constituent companies may be continued, or the existence of one, only, of the several corporations may be continued, or the existence of all may be extinguished and a new corporation be formed, and in determining which of such results follows a particular agreement it is necessary to consider the true intent and purpose of the parties as expressed in the merger agreement, viewed in the light of the statute under which the merger was effected.

2. Railroads—*meaning of word "purchase" in act authorizing one railroad to purchase another.* Section 1 of the act of 1885, authorizing one railroad corporation "to purchase and hold in fee simple or otherwise, and to use and enjoy the railway property, corporate rights and franchises" of other railroad corporations, gives the right to acquire such properties by any form of lawful agreement, and it is not necessary that the transaction should take the form of a technical sale.

3. Same—*how one railroad corporation may acquire property of another.* Under section 1 of the act of 1885, relating to the purchase of the property of one railroad company by another, it is sufficient if the contract has the effect of merging the property, franchises and corporate rights of the merging company into the merger corporation, and that as a net result of the transaction the merger corporation has lawfully acquired the property and franchises disposed of by the other corporation.

4. Same—*when merger agreement does not provide for a new corporation.* A merger agreement between three railroad corporations, which provides that two of them have sold to the other all of their property and franchises; that the purchasing corporation shall hold the property forever, unto itself and its successors and assigns; that the name of the purchasing corporation shall remain the same until changed in a manner prescribed by law, and provides for an increase of the capital stock of the purchasing corporation and for the adjustment of the assets and liabilities of the merging companies and the rights of the stockholders, does not provide for a new corporation but continues the existence of

the purchasing corporation, with an increase of capital stock, as the successor to the title, rights and duties of the others.

5. Words and phrases—*legal signification of the word "purchase."* The word "purchase," in its enlarged and legal signification, means the acquisition of real property by any voluntary act of the parties as distinguished from title by descent, which results from the operation of the law.

Appeal from the Circuit Court of Sangamon county; the Hon. James A. Creighton, Judge, presiding.

William H. Stead, Attorney General, and Thomas E. Dempcy, (Noleman & Smith, of counsel,) for appellants.

George B. Gillespie, (E. H. Seneff, and Gillespie & Fitzgerald, of counsel,) for appellee.

Mr. Justice Vickers delivered the opinion of the court:

The Chicago and Eastern Illinois Railroad Company was duly incorporated under the laws of Illinois on the 6th day of June, 1894, for the period of fifty years. Its capital stock was $25,000,000. It owned and operated certain lines of railroad in Illinois and connected at the Indiana line with the Evansville and Terre Haute Railroad Company, an Indiana corporation, which owned a line of railroad in the State of Indiana which terminated in the city of Evansville, in the said State. The Evansville Belt Railway Company, another Indiana corporation, owned a system of belt lines and terminal facilities in the city of Evansville. The railroad lines of the two Indiana corporations were operated under a lease by the Chicago and Eastern Illinois Railroad Company. The three railroads thus operated constituted a continuous line of railroad from Chicago to Evansville, Indiana. By a tripartite agreement duly entered into on the 20th day of July, 1911, the two Indiana corporations were merged into the Illinois company, since which time the entire properties of the three corporations have been owned and operated by the Chicago

and Eastern Illinois Railroad Company under its original charter. The agreement provided for a retirement and cancellation of the stock of the Indiana companies and a substitution of the stock of the Illinois company upon a basis satisfactory to the contracting parties and their respective stockholders. To enable the Illinois company to fulfill its part of the agreement in the substitution of its stock for the stock of the Indiana corporations, it became necessary, or at least desirable, to increase the capital stock of the Illinois corporation to $30,000,000. After the execution of the articles of merger and consolidation the Chicago and Eastern Illinois Railroad Company filed a copy thereof in the office of the Secretary of State and tendered that officer $5000 as filing fees, being the statutory allowance of one dollar for each $1000 increase of the capital stock of said company. The Secretary of State insisted that the effect of the merger contract was to create a new corporation of $30,000,000 capital stock and demanded $30,000 additional fees. The $30,000 was paid under protest, and was received by the Secretary of State with the understanding that if it should be determined that the $30,000 was not due under the law it would be returned to the party paying the same. The Illinois company filed a bill in the circuit court of Sangamon county praying for an injunction enjoining the Secretary of State from paying the $30,000 to the State Treasurer, and for a decree commanding him to account to and pay the same over to the Chicago and Eastern Illinois Railroad Company. While the action was pending the Hon. James A. Rose, Secretary of State, died, and Cornelius J. Doyle, his successor, was substituted as defendant. Elizabeth M. Rose, executrix of the last will and testament of James A. Rose, deceased, was substituted in the place of James A. Rose, individually, and she entered her appearance and joined in a general demurrer to the bill. The cause was heard upon a demurrer to the bill. On the hearing of the demurrer it was stipu-

lated by the Attorney General and counsel for complainant that the sole question to be determined was whether, under the law of this State, the merger agreement was the organization of a new corporation; that if, upon a consideration of the demurrer, the court shall find that a new corporation was organized then the court shall enter a decree dismissing the bill, and if the court shall find that no new corporation was organized under the law and under the merger contract set out in the bill, then the court shall enter a decree, in accordance with the prayer of the bill, restraining the payment of $30,000 into the State treasury and directing the same to be paid to the Illinois company. It was further stipulated that both parties reserve the right of appeal from the decree, agreeing, however, that in case of an appeal this court should be limited to the single question submitted upon the demurrer to the circuit court. The circuit court of Sangamon county decided the question submitted in favor of the complainant and entered a decree as prayed for in the bill. To reverse this decree the defendants below have appealed to this court.

Three conditions may result from a merger or consolidation agreement between railroad companies: (1) An agreement or consolidation may be effected of two or more corporations and the corporate existence of each of the constituent companies continued; (2) the agreement may result in the merger of one or more corporations into another and provide for the continuance in existence of only one of the companies and the extinguishment of the others; (3) the consolidation may result in the extinction, at the same time, of all the constituent companies and the formation of a new corporation as the successor of all the contracting parties. In determining which of these results follows in any given case it is necessary to consider the true intent and purpose of the contracting parties as expressed in the agreement, in the light of the statute under which the union is effected. 2 Morawetz on Private Corp. sec.

942; 5 Thompson on Corp. sec. 6042; *Racine and Mississippi Railroad Co.* v. *Farmers' Loan and Trust Co.* 49 Ill. 331; *Chicago, Santa Fe and California Railway Co.* v. *Ashling,* 160 id. 373.

Section 1 of an act of the legislature relating to consolidation of railroad corporations, passed in 1885, provides "that all railroad companies now organized, or hereafter to be organized, under the laws of this State which now are or hereafter may be in possession of, and operating in connection with, or extension of their own railway lines, any other railroad or railroads, in this State or in any other State or States, or owning and operating a railroad which connects at the boundary line of this State with a railroad in another State, are hereby authorized and empowered to purchase and hold in fee simple or otherwise, and to use and enjoy the railway property, corporate rights and franchises of the company or companies owning such other road or roads, upon such terms and conditions as may be agreed upon," etc. The statute makes provision for the method of effecting such transfer or merger, and by a proviso added to said section the consolidation of competing parallel lines of railroads is prohibited. It was under the foregoing section of the statute that the agreement which effected the consolidation was made.

It will be observed that the language of the statute authorizes and empowers railroad companies "to purchase and hold in fee simple or otherwise, and to use and enjoy the railway property, corporate rights and franchises," etc. Manifestly, the word "purchase" in this statute is not used in its popular and commercial meaning as equivalent to the word "buy," but in its more extended legal meaning, as including every mode of acquiring title to real estate other than by descent. "Purchase," in its enlarged and legal signification, means the acquisition of real property by any voluntary act of the parties as distinguished from title by descent, which results from the operation of the law.

(7 Words and Phrases.)    When the legislature authorized railroad companies, under certain conditions and limitations, "to purchase and hold" the property rights and franchises of other railroad companies, the power was thereby granted to acquire such properties by any form of lawful agreement, and it is not necessary that the transaction should take the form of a technical sale, in which it is necessary that there should be a vendor and a vendee and a *quid pro quo*.   It is sufficient that the contract or agreement has the effect of merging the properties, franchises and corporate rights of the merging company into the merger corporation, and that as a net result of the transaction one corporation has disposed of its property and franchises and the merger company has acquired them in a lawful manner.    Authority exists under this statute for the making of a consolidation agreement between railroad companies that are in a position to avail themselves of the statute, that will produce any one of the three results above stated.   If but one of these results could be legally obtained under the statute any agreement formed thereunder would be presumed to intend that result, and this for the reason that it will not be inferred that parties to contracts intend to accomplish an illegal purpose.   All presumptions are in favor of the legality of contracts, and courts incline, in construing contracts, to so interpret them as to avoid an unlawful result.   In the case in hand, however, we are not materially aided to a conclusion by this rule, since under the broad power conferred by the legislature the construction contended for by appellants is as free from legal objections as that contended for by the other party.

Turning from the statute to the words of the agreement itself, which, after all, must be the final resort in the construction of all written documents, we think the solution of the single question preserved for review on this record will be readily obtained.   The agreement, after reciting the situation of the several properties and the manner in which

the same have been operated, and the purpose to consolidate the several properties for the reason, it is said, that it will promote the interests of the companies and increase their ability to perform their duties to the public as common carriers, provides by the first clause that the said "constituent companies do hereby consolidate, unite and merge their several railways, their several properties, capital stocks, franchises, rights and privileges, in and into one corporation, to-wit, the Chicago company, upon the terms, conditions and agreements set out in the following articles." The next clause recites that "the Terre Haute company and the Belt company, severally and respectively, subject to all mortgages, leases and other obligations which are liens or charges thereon or on any part thereof, have granted, bargained, sold, assigned, aliened, remised, released, conveyed and affirmed * * * unto the Chicago company all and singular the railroads and all other property, real or personal, wherever situate, and all franchises, rights, privileges and immunities, owned, held or enjoyed by the Terre Haute company or by the Belt company." All of the words necessary to effect a complete conveyance and transfer are here employed. But if any doubt existed as to what was intended there is an explanatory clause following which must dispel it. That clause reads as follows: "It being the intent of this indenture to hereby convey to and vest in the Chicago company, generally, all the property of the Terre Haute company and all the property of the Belt company, real, personal or mixed, and all franchises, rights and privileges of the Terre Haute company and of the Belt company, within and without the State of Indiana, together with all and singular the tenements, hereditaments, rights, members, easements and appurtenances of said railroads and premises," etc. To this is appended a *habendum* clause, as follows: "To have and to hold all and singular the above mentioned and described railroads, franchises and other property and all other prem-

ises hereinbefore expressed to be conveyed, with the appurtenances, unto and to the use of the Chicago company, its successors and assigns, forever." In consideration of the premises the constituent companies further agree "that the name of the Chicago company, until changed in the manner prescribed by law, shall be and remain Chicago and Eastern Illinois Railroad Company;" that the Chicago company should assume all debts and obligations that were liens upon the property of the merging companies; that the principal office of the Chicago and Eastern Illinois Railroad Company should be and remain in the city of Chicago and State of Illinois, and that its capital stock should be $30,000,000, divided into 300,000 shares of $100 each, of which 150,000 shares should be common stock and 150,000 shares preferred stock. Provision is then made for the exchange of stock and bonds outstanding against the merging companies, and it is further provided that stockholders of the merging companies shall have the same rights and privileges in the Chicago company as other stockholders, and that the by-laws, rules and regulations of the Chicago company should remain in full force until they were abrogated or amended according to law. By another provision of the agreement it is provided that "by the execution and delivery of this indenture, and the subsequent filing thereof, as aforesaid, no new corporation is or will be created, but the corporate existence and organization of the Chicago company formed by the execution, delivery and filing of its articles of consolidation bearing date of the 6th day of June, 1894, will be continued during the remainder of the period of fifty years from and after the said 6th day of June, 1894." Fairly construed, this agreement amounted to a merger of the two Indiana corporations into the Illinois company and a continuation of the corporate existence of the latter as the successor in title, rights and duties of the merging companies, with an increase in the capital stock of the Illinois company of $5,000,000.

Much is said in the argument about the terms "merger" and "consolidation," and distinctions are sought to be drawn between the two forms of contract. We do not attach great importance to this line of argument. While there appears to be a distinction recognized by most of the authorities between a "merger," strictly speaking, and a "consolidation," still the terms are not always used with strict accuracy. Besides, the agreement under consideration employs both terms, so that the true intent of the agreement cannot be determined by recourse to the dictionaries.

Our conclusion is that the court below properly held that there was no new corporation formed by the agreement between these corporations.

The decree of the circuit court of Sangamon county will be affirmed.

*Decree affirmed.*